E-FILED
Tuesday, 31 January, 2006  03:09:33 PM
Clerk, U.S. District Court, ILCD

United States District court, Central District
of Illinois For The Springfield Division

Michael Thomas,

Plaintiff

**RECEIVED**

JAN 3 0 2006

V.

U.S. CLERK'S OFFICE
SPRINGFIELD, ILLINOIS

Case No. 06-3020

Lt. Law, Lt. Marty Winston,
correctional officer Kevin Rigg,
Lt. John Doe, correctional
officer John Doe #1,
correctional officer John Doe #2,
Defendants.

In their Individual
and official capacity

civil Rights complaint
pursuant to 42 USC § 1983
(state prisoner) action
against state officials
for constitutional violations.

Demand For Jury Trial

Now come the Plaintiff, Michael Thomas, pro se, and
states as follow:

That my current address
and information is:

Michael Thomas
Prison Registration No. # B-71744
P.O. BOX 99
700 W. Lincoln St.
Pontiac correctional center
Pontiac, IL 61764

The above listed Defendants are all prison officials for the state of Illinois at the Western correctional center. Three (3) of the prison officials are Lieutendant officer's and the remaining three (3) Defendants are non commission correctional officers without rank.

### Parties:

#1) Lt. Law is a Lieutendant officer at the western correctional center or was on 7-22-04. Lt. Law worked on the 7-3 shift. (morning through afternoon) Lt. Law's first name is unknown at this time to plaintiff. Lt. Law is a white male.

#2) Lt. Marty L. Winston is a Lieutendant officer at the western correctional center or was on 7-22-04. Lt. Winston worked on the 7-3 shift. (morning through afternoon) Lt. Winston is a white male.

#3) Correctional officer Kevin R. Rigg is a correctional officer at the western correctional center or was on 7-22-04. Correctional officer Rigg worked on the 7-3 shift. (morning through afternoon) C/o Rigg is a white male.

#4) Lt. John Doe is a Lieutendant officer at the Western correctional center or was on March 20, 2005. Lt. John Doe's full name is unknown to plaintiff at this current time. However, this Lt. John Doe transported plaintiff with another officer on March 20, 2005 from western correctional center to the Pontiac correctional center from about 7:30 - 10:30 A.m. Lt. John Doe worked on the 7-3 shift. (morning through afternoon) Lt. John Doe is a white male.

#5) correctional officer John Doe #1 is a correctional officer at the western correctional center or was on 3-20-05. C/o John Doe #1's full name is unknown at this current time. C/o John Doe #1 and Lt. John Doe both transported/escorted plaintiff to the Pontiac correctional center from the western correctional center from 7:30 - 10:30 A.m. on 3-20-05. C/o John Doe #1 worked on the 7-3 shift. (morning through afternoon) C/o John Doe #1 is a white male

#6) Correctional officer John Doe #2 is a correctional officer at the western correctional center or was on 3-20-05. C/o John Doe #2's full name is unknown at this current time. C/o John Doe #2 took plaintiff

on a medical furlough on 10-25-04 while at western correctional center to see Dr. Wilson (specialist) near or in Jacksonville for testicle related complications. C/o John Doe #2 worked on the 7-3 shift. (morning through afternoon) C/o John Doe #2 is a white male.

## Preliminary Statement

This is a civil action complaint pursuant to 42 USC § 1983 by a state prison against western C.C. prison officials for violating his 8th Amendment rights to the United States constitution when these prison officials beat, kicked, punched and put a loaded gun to plaintiff's face at close range. These acts by prison officials occurred on two (2) seperate occassions and were applied in bad faith to deliberately cause physical and mental harm as well as pain to the plaintiff in a malicious and sadistic manner.

On the first occassion on 7-22-04 C/o Rigg told other prison officials that plaintiff and other inmates walked off the prison recreational yard in a "leisure" manner. C/o Rigg called other officers where a search and seizure was performed on the yard in front of other inmates. Plaintiff and several other inmates were then physically attacked by

prison officials and called several names including racial degrading names. During this incident plaintiff was struck in testicles twice, thrown against a concrete wall and gate, face first. Plaintiff's testicles then became enlarged from swelling, in pain and experiencing bleeding. Doctors at the Western C.C. noted the condition and determined that plaintiff's testicles developed "epidemytis." Plaintiff began ongoing treatment and was treated on numerous occassions for the swelling and pain of the testicles. Plaintiff also had to be sent to an off ground specialist for his condition

On the second incident on 3-20-05, plaintiff was beat, kicked, punched and had a gun pointed to his face. On this second incident plaintiff and another guard, Albert (not a Defendant) got into a verbal argument about breakfast. C/o Albert told plaintiff that he was not eating because plaintiff was holding the door for other inmates. when plaintiff asked to speak with C/o Albert's supervisor, Albert became enraged and tried to attack plaintiff. In fear of his safety, plaintiff threw his hands up in a defensive mode and contact was made with the officer one time. Plaintiff then "backed up and away" from Albert telling the guard that he did not want trouble or a physical altercation and that the incident

was an accident. Plaintiff was then taken to the segregation unit at the prison "without further incident" or struggle or resistance.

Plaintiff tried to tell prison officials that the incident on 3-20-05 with %o Albert was an accident because plaintiff became nervous after the officer ran into his face. Other prison officials were upset and told the plaintiff that he was lying and calling him names and then at or about 7:35 A.m, beat plaintiff while he was about to be transported from western c.c to Pontiac c.c which was more than three(3) hours after the incident between plaintiff and %o Albert. Furthermore, plaintiff was subdued, handcuffed, restrained on feet and was noncombative. The actual guard that the incident occurred earlier that morning with (Albert) was not present and did not harm plaintiff. %o Albert is not a Defendant in this § 1983.

The Second incident was malicious and sadistic because officers used excessive force that was uncalled for and unnecessary because the incident with %o Albert occurred 3 hours earlier at or around 4:30 A.m and was on a totally different working shift. The Defendants here are all prison guards that work on the 7-3 shift. Not the 11-7 shift that %o Albert worked on.

As prison officials were about to transfer plaintiff so that Albert and plaintiff would not have further

incidents or potential problems, plaintiff was placed in full body restraints. Plaintiff's hands were cuffed. Plaintiff had leg restraints on. Plaintiff also had a body chain wrapped around his waist connecting the handcuffs. Then prison officials put plaintiff in the escorting vehicle and fastened him into the seat belt.

Once plaintiff was fully restrained and fastened into the seat belt, two (2) correctional officers and one supervising Lieutendant, beat, kicked and punched plaintiff and then the Lieutendant put a loaded gun to plaintiff's face and threatened to kill him. One of these guards that beat plaintiff, struck him and kicked him in the testicles several times when he knew that plaintiff had testicle problems because this officer, %o John Doe #2, escorted plaintiff on plaintiff's medical furlough to the off ground specialist a couple months before the incident on 10-25-04.

On both occassions, (7-22-04 and 3-20-05) the force used was uncalled for and unnecessary. On both occassions plaintiff was seized by officers which plaintiff complied to. However, once plaintiff was seized, guards at the prison, struck, punched, kicked and put a loaded gun to plaintiff's face after he was subdued and non combative.

Plaintiff has written several complaints and grievances with prison officials which were either ignored, destroyed, threw away or refused to be investigated. Prison officials have refused to answer to the matter.

As a result of prison officials malicious and sadistic attacks on plaintiff and due to unnecessary and excessive force, plaintiff had to be treated and prescribed various medications on numerous times to remedy his swollen, damaged and painful testicles. Plaintiff has been examined not only by Doctors at Western C.C whom first tired to cure the problem but plaintiff has been seen by Doctors at Pontiac c.c whom have ran several test on plaintiff including test to determine why plaintiff's testicles have "occult blood" (abnormal damages and bleeding) and swelling.

Pontiac c.c. have also had specialist from other clinic's come to Pontiac to treat and or evaluate plaintiff with medical devices. Plaintiff never had testicle problems before the incident on 7-22-04. Plaintiff had witnesses that observed the first incident of excessive force and prison officials swept that evidence under the rug to protect and cover up abusive officers misconduct which is constantly occurring at Western correctional center.

Prison officials actions were taken in bad faith and for the sole purpose to use pain and fear as a way

to punish inmates that they feel misbehaved. Officials
did not care if a prisoner was innocent or guilty
or whether a incident or disturbance was over with —
these prison officials here, still beat plaintiff even
while plaintiff was defenseless in full body shackles
and restraints and was fastened into a seat belt.

Plaintiff now moves this Honorable court for relief
and justice for damages suffered against him by
Defendants whose acts were in violation of the
8th Amendment and against Federal law. These prison
officials actions caused plaintiff unnecessary pain,
suffering and mental anguish

Jurisdiction

1) The court has jurisdiction over the plaintiff's claims
of violations of the United States constitution pursuant
to inmates in state custody. 28 USC § 1331 (A) and
42 USC § 1983.

2) All Defendants in this complaint work for the state
of Illinois to the best of plaintiff's knowledge and
act under "color of state law."

3) Western correctional center is located in Brown county, Mt. Sterling, Illinois

## Litigation History

1) Plaintiff, Michael Thomas, has not brought any other lawsuits in state or Federal court dealing with the same facts involved in this complaint.

2) Plaintiff has previously file two (2) other lawsuits in Federal court but not in relation to this matter.

3) One of the cases mentioned in the previous paragraph was dismissed for "lack of Jurisdiction" because plaintiff filed a complaint against his ex-private attorney for "Breach of contract" in the wrong court. (See order from The Honorable Judge Blanche M. Manning which is attached marked as Ex.#1)

4) The other lawsuit is still pending, which is a complaint against prison officials for Deliberate indifference to a serious medical need. See Case No. 04-1321, Peoria Division of Central Illinois in the Honorable Judge Harold A. Baker's court.

5) Plaintiff also filed an interlocutory appeal in case No. 04-1321 early in that litigation after the court dismissed all but one of those claims. The court later reconsidered the claims and reinstated majority of the claims and the Appeal was later dismissed, without hearing it or filing Briefs because plaintiff did not pursue the appeal because the Honorable court informed plaintiff that he was not suppose to appeal until all claims had been adjudicated.

## Exhaustion of Administrative Remedies

1) There is a grievance procedure for inmates in state custody for the entire state of Illinois.

2) Plaintiff has filed several grievances on both incidents in regard to prison officials for using excessive force which occurred on both incidents at western correctional center. (See Ex#2, Ex#3, Ex#4, Ex#5 and Ex#6)

3) The first grievance in regard to Lt. Law, ℅ Rigg and Lt. Winston that occurred on 7-22-04 was ignored by Western grievance officer, Sue Redshaw. Redshaw gave

a response for a personal property issue when the
grievance regarded staff misconduct and excessive
force. (See Ex # 2)

4) Plaintiff filed another grievance in regard to Lt. Law,
C/o Rigg and Lt. Winston which was responded to by
grievance officer, Redshaw but did not discuss any of
the Defendants misconduct of excessive force. Redshaw's
response only reiterated the officers version of events
and the punishment that plaintiff received. Thus, the
grievance officer for the second time refused and
deliberately disregarded and ignored plaintiff's claims
of excessive force and refused to address issue.
(See Ex # 3)

5) After getting grievances back from Redshaw, plaintiff
filed these two grievances with the Administrative Review
Board (ARB) (See grievance NO. 04-0826 on Ex # 2 and
Ex # 3) These grievances are dated 8-9-04 and 9-7-04
by plaintiff respectfully. Both of these grievances have
the same grievance NO. 04-0826 because both pertain
to excessive force for the same incident on 7-22-04
although prison authorities don't specifically comment
on the excessive force claim in either grievance. (See
Ex # 2 and Ex # 3)

6) On 7-25-05 the plaintiff wrote the ARB asking why the two grievances (No. 04-0826) were not answered (see Ex #7) The ARB claim that they never received the mail (grievances) although plaintiff was charged for postage for both of the grievances on two seperate occassions. see trust fund audit from western c.c; check No. 71812 on 10-27-04 and check No. 72113 on 11-24-04 (marked as Ex # 8 and Ex #9) The Trust Fund Audit prove that plaintiff mailed these grievances in a timely manner. Further more, plaintiff also has P-96 money voucher for proof of payment for both grievances to the ARB which are properly dated and specificially states that the documents are to the "ARB." (See Ex #10 and Ex #11 which are the prison "Request for payment" forms)

7) Plaintiff also filed grievances for the second incident that occurred on 3-20-05 when officials beat, kicked, punched and put a gun to plaintiff's face. Plaintiff filed this grievance dated 3-28-05 to the ARB on 4-11-05 while at the Pontiac c.c. (See Ex #5 which is a grievance); also see Ex #12 which is the Inmate "Legal mail card" from Pontiac c.c records/mail office which prove that the ARB was sent the grievance on 4-12-05; (also see Ex #15 which is Trust Fund

records for postage from 4-12-05 to the ARB.)

8) Plaintiff was called to hear other grievances before the ARB but when the chairperson of the ARB, Melody Ford, came to see plaintiff she would not tell plaintiff what grievance she was there to hear. All Ms. Ford told the plaintiff was, the hearing regarded the 3-20-05 with C/o Albert. (See Ex #13 which is a letter to the ARB dated 8-7-05) Thus, chairperson, Ford, did not want to hear claim about misconduct of other staff members. Chairperson only wanted to know about incident with C/o Albert that occurred at 4:30 A.m on 3-20-05, not the beating by the other officers at 7:30 A.m (3 hours later) after C/o Albert left work.

9) The ARB responded to letter dated 8-7-05 by telling plaintiff to "put in grievance form" when plaintiff already had done so on several occassions and sent to ARB for their review. In spite of plaintiff's efforts which were all in compliance with Department Rules, prison officials refused to answer plaintiff's claims (See Ex #14)

10) On both seperate occassions (incidents from 7-22-04 and 3-20-05) plaintiff filed several grievances with

prison and ARB. The issues (claims) of misconduct, beatings and excessive force were deliberately ignored and not answered to. Plaintiff made every effort to have officials look into matter and to hear the grievances and to learn of the identities of the remaining prison officials that beat him but prison officials refused to provide plaintiff that information. (See EX#16, EX#17 and EX#18)

11) Prison Authorities gave plaintiff the run around. These officials would not answer or look into either incldent and told plaintiff that they never received plaintiff's grievances about the excessive force beating claims when it is well documented that such documents were filed by plaintiff and mailed off which postage fee's for U.S. mail was taken off plaintiff's prison Trust Fund account. (See EX#7, EX#8, EX#9, EX#10, EX#11 and EX#13) Further more, plaintiff repeatedly attached the grievances to his letters. (See letters dated 7-25-05 and 8-7-05 which are marked as EX#7 and EX#13) The ARB of inmate issues even stamped these documents but would not answer the grievance and refused to consider and or investigate the matter.

12) The ARB also told plaintiff to file grievance on issue when plaintiff had already filed grievances on the

issues and sent it to the ARB on several occassions
with letters and grievances attached. (see letters dated
8-7-05 which the ARB received on 8-10-05 marked as
EX # 13)

13) Plaintiff has filed numerous grievances in accordance
with the Prison litigation Reform act of 1996, a point
which prison officials are aware of but officials will not
answer or reply to any of the grievances fully or follow
their own rules in responding to grievances filed by
inmates against them.

14) For the above stated facts and proof from numerous
documents, it is obvious that plaintiff filed several
grievances and made numerous request to have prison
officials answer these matters from two(2) seperate
incidents.

15) Prison officials refused to comply to the grievance
procedure. A year and a half has elapsed since the
first incident on 7-22-04 and that grievance was
mysteriously lost, destroyed or allegedly misplaced
although plaintiff sent two(2) "seperate" grievances
at western c.c on the first incident and both, accordingly
to the ARB, were not received but check NO. 71812  on

10-27-04 and check No. 72113 on 11-24-04 proof that plaintiff sent the documents off. (See EX #8 and EX#9) (Also see P-96 payment for postage on EX#10 and EX#11 where it clearly states postage to the "ARB.")

16) In regard to the second incident, this grievance was not answered to either. The ARB told plaintiff to "put in grievance form" when it was already in grievance form and attached to letter. (See 6th paragraph of letter dated 8-7-05 by plaintiff marked as EX#13; also see answered dated 8-10-05 to the matter marked as EX#14; See EX#5 also.)

17) Plaintiff has also tried to have officials answer these grievances by filing more grievances and writing numerous letters to various state officials on numerous occassions in an attempt to have officials answer the grievances or to correct the problem. (See EX#19 and EX#20)(which is another grievance and letter plaintiff sent to ARB); Refer to EX#12 which is the inmate "Legal mail card" for proof that mail/documents were sent to the ARB on 11-17-05 for EX#20.)

18) Plaintiff has also made his complaints known to the Chief Investigator for the Illinois Department of

corrections. (See EX # 25 and EX # 21 )(Also See EX #22 which is a document from the Deputy Director for the Department of correction, claim that the plaintiff's grievance was "denied" by the ARB but the ARB never actually heard the grievance or sent plaintiff the response. Also see EX #23 which Deputy Director refers to. This hearing, however, was not on "excessive force" and no where does it mention it.)

19) Plaintiff has made his complaints known to the United States Justice Department as well. (See EX #24 and EX #12) Plaintiff even wrote the Attorney General, Lisa Madigan, about the incidents at western correctional center. (See EX #12 for a letter dated 5-25-05 which is documented on prison "legal time card" which documents all of inmate legal correspondence.)

20) It shall also be noted that plaintiff has been incarcerated since 1996 and is quite aware of the grievance procedure and the appropriate steps one must follow or take to grieve a matter. (See EX#26, EX#27, EX#28, EX#29, EX#30, EX#31, EX#32, EX#33, and EX#34, which are some of the previously filed grievances to the ARB from plaintiff that the

plaintiff has in his possession) Plaintiff's master file
(if allowed Discovery) will show plaintiff has filed
entirely more grievances to the ARB which demonstrates
that the plaintiff is well aware of the grievance procedure
and has followed it on numerous occassions before filing
grievances on the claims presented in this § 1983.

21) Plaintiff has also tried to copy his grievances on
several occassions so that he could mail them to the
ARB again and the Law Librarian, Paula Rich and her
supervisor, mark spencer, denied plaintiff more copies.
(see Ex # 35, Ex#36, Ex# 37 and Ex # 38)

22) Plaintiff also learned that he was not the only
inmate that was being denied copies of grievances or
other legal material. (see Affidavits of Inmate
Murray and Inmate shields marked as Ex # 39
and Ex # 40; also enclosed are denial forms for
Inmate shields marked as Ex#41 and Ex #42)

23) Plaintiff has repeatedly and continuously attempted
to have those grievances answered. Plaintiff wrote
the Records office supervisor, wayne R. Germain at
Pontiac and the grievances to the ARB from
3-28-05 were not there. (See Ex #43) Plaintiff

also asked the ARB to check their files to see
if they made a mistake and forgot to hear the
grievance. (See Ex #20) Plaintiff also made it
clear that Pontiac prison of denying copies of
grievances and would not allow plaintiff to copy
the grievances any more which plaintiff also grieved
to prison Authorities because it prevented plaintiff
from sending ARB more copies of grievance in case
the ARB lost or misplaced the other ones. (See Ex #44)

24) Plaintiff's time to file suit is wearing down
and officials have not and refused to address the
Issues complained of in this Section 1983 although
Department Rule 504.850(F) States that the ARB
has "6 months" to hear grievances.

25) The "6 month" time frame to answer grievances
has expired on both incidents and it is obvious
that plaintiff has filed grievances in compliance
with the Department Rules and regulations and
the Prison Litigation Reform act

26) The grievance procedure is complete because
officials have not answered any of the grievances
and are continue to give plaintiff the run around

because these officials do not want to discipline officers whom have histories of physical and mental abuse as well as racism against state prisoners at the Western correctional center.

27) In furtherence, prison officials are deliberately giving plaintiff the run around in an attempt to discourage litigation and to use this as a defense in a court of Law by stating, falsely, that prison officials were allegedly unaware of either of the excessive force incidents or trying to argue that plaintiff did not follow the proper procedures when in fact, plaintiff did so and made efforts on numerous occassions to have prison officials address his grievances which were all timely and in compliance with Department Rules. Even Deputy Director, Orr, claim that the grievance was heard (denied) but plaintiff never received the ARB's response to the grievance dated 3-28-05. (See Ex# 22)

28) Such a scheme denies a prisoner access to the court if prison officials can convince a court that a plaintiff did not comply to the Prison Litigation Reform Act. However, it is obvious that plaintiff has been in compliance to the PLRA and officials are trying to use those

tactics as a scheme to escape liability and or
to avoid addressing racism, hatred, physical and
mental abuse by western correctional center which
the entire state of Illinois is aware of and has
been aware of for quite some time.

29) Because prison officials have refused to answer
or address any of the grievances, plaintiff did not have
available administrative remedies because officials
have prevented plaintiff from exhausting those remedies.
Plaintiff has made every effort possible and officials have
ignored, destroyed and allegedly misplaced the documents
on several occassions and prison records demonstrate
that plaintiff filed and mailed those documents in a
timely manner as instructed by Department Rules and
the Prison Litigation Reform Act.

Witnesses In support of claims

1) Bryant Campbell #K-62579 (witnessed incident on 7-22-04)
2) Inmate Boyd (witnessed incident on 7-22-04)
3) Inmate Hayes (witnessed incident on 7-22-04)
4) Anthony B. Howard #N-61597 (witness other incidents)
5) Jesus Moreno #B 59854 (witness %0 Albert Incident)
6) Inmate Terrel (witness %0 Albert incident)
7) Numerous other Inmates (Names unknown at this time)

## Chronology and statement of facts

1) On May 5, 2004 the plaintiff, michael Thomas, was transferred to the Western c.c. in Brown county in the state of Illinois

2) Shortly after plaintiff's arrival, plaintiff had been the victim of racism, hatred, had been lied on and physically attacked all of which were by prison officials whose actions were not used or applied in a good-faith effort to restore discipline or to maintain order in prison but was used and or implemented in bad-faith to sadistically and maliciously cause pain to plaintiff and to use physical force as a way of punishment.

3) Plaintiff pursues this lawsuit against prison officials for excessive fore on two (2) seperate incidents while he was incarcerated at Western c.c. The first incident occurred on 7-22-04 at approximately 2:00 - 2:25 p.m and the second incident occurred eight (8) months later on 3-20-05 at approximately or between 7:30 - 7:45 a.m

4) During the first incident on 7-22-04, plaintiff was on the North recreational yard at Western c.c. The prison has two (2) recreational yards. One yard is referred to

as the North yard and the other yard is referred to as the south yard respectfully. The North yard is the larger of the two yards and it's length is several hundred or about 800 feet long.

5) On the above stated date, (7-22-04) plaintiff was exercising on the far weight pad at the far end of the North yard. There are approximately two(2) weight pads on the North yard. One weight pad is about 30 feet from the front gate and the other weight pad (where plaintiff was exercising) is about 700 and some odd feet away at the back or far end of the yard from the front gate.

6) Around 2:00 p.m plaintiff and the other inmates present heard prison officials state that yard was closed over the bull horn and to meet at the front gate. Plaintiff and approximately 4-5 other inmates that were also on the far weight pad starting gathering their belongings (T-shirts, gloves, radio's, jackets etc...)  and then started walking toward the front gate as ordered.

7) When plaintiff and the other inmates got within 100 feet or so of the front gate, a correctional officer named Rigg (C/o Rigg) approached them and asked how come they didn't report to the gate sooner. Plaintiff

and the other inmates stated that they came from the
back weight pad and further explained that they had
to walk a long distance to the front gate. C/o Rigg then
asked for plaintiff's I.D. as well as the other inmates
I.D. Plaintiff and the other inmates complied to the
orders of C/o Rigg and gave him their I.D. cards.

8) C/o Rigg then called for back up. Several other prison
officials arrived within 1-2 minutes. C/o Rigg spoke to
these officials and told them that the plaintiff and
the other inmates didn't obey his orders to exist the
yard and that plaintiff and the other inmates walked
to the front gate in a "leisure" manner.

9) Several of these prison officials started harassing
plaintiff and the other inmates. Two (2) of the reporting
prison officials were Defendants, Lt. Marty Winston and
Lt. Law. These prison officials then told plaintiff and
the other inmates to take their shoes off and then told
plaintiff and the other inmates to line up for a search.
All the inmates including plaintiff complied to the orders.

10) During this incident, these Defendants (Lt. Law, Lt. Winston
and C/o Rigg) and the other prison officials present started
harassing plaintiff and the other inmates calling them names

such as "idiots," "a bunch of clown's," and "dumb
ass niggers." These officials also made comments about
inmates "better learn to move fast when they are told to
at Western." Plaintiff or none of the other inmates
called prison officials any names. All plaintiff and the
other inmates said was that they did not do anything
and did report to the front gate as soon as they heard
that yard was over but that they had to walk further
than the inmates on the front weight pad (30 feet away)
because they were at back weight pad (700 feet away)

11) During this incident while plaintiff's shoes were off,
Lt. Law grabbed plaintiff's testicles, squeezed them hard
and then yanked them in a hard and forceful manner.
Plaintiff fell to the ground in pain and was holding himself
as the other inmates looked on and witnessed the incident.
While plaintiff was on the ground Lt. Law ordered that
plaintiff stood up and let him (Lt. Law) finish or "catch
a new case." Plaintiff stated that he did not do anything
and then Lt. Law said that he (Lt. Law) would tell
authorities that he (plaintiff) assaulted him and
he would be prosecuted in Brow county court and that
plaintiff would be found guilty. (see EX #2, EX #3
and EX #4 which is plaintiff's grievances and also see
EX #45 which is an Affidavit of eyewitness that was
present.)

12) Plaintiff then stood up as Lt. Law had ordered. Lt. Law then told plaintiff to spread his legs and strech his arms out and to look straight ahead. When plaintiff complied to Lt. Law's orders, Lt. Law then struck plaintiff in his testicles with a hard blow with clenched fist. (See Ex #45 which is Affidavit of witness Campbell to this Incident.)

13) Several minutes later plaintiff was ordered to get up off of the ground. Then approximately 10 minutes or so later plaintiff and other inmates were all taken to disciplinary segregation for "unauthorized movement" and "disobeying a direct order." (See prison disciplinary ticket authored by C/o Rigg marked as Ex # 46)

14) As plaintiff and the others were being taken to the segregation unit, prison officials continued to use unnecessary and excessive force. Lt. Winston had put handcuffs on plaintiff tightly and throwed plaintiff against wall and fence, face first, when plaintiff was not resisting, fighting or struggling with any of these prison employee's because plaintiff told other inmates to call their families and to contact the police and Governor Blagovich to let them know about the physical and mental abuse as well as racism at that institution (see Ex # 45)

15) Lt. Winston pushed plaintiff's face into the concrete
wall and gate and told plaintiff that he (Lt. Winston)
"didn't know where he (plaintiff) thought he was at."
Then Lt. Winston stated that "Brown county is our county
and if you (plaintiff) knew what was best for you, you'd
shut up or we'll shut you up."

16) Inmates in the building were watching and asking these
officials out of their windows not to beat the plaintiff
and the other inmates because they witness how Lt. Winston
and the other prison officials were using unnecessary
force because a couple other inmates were screaming
from excessive force being used against them although
these inmates were not resisting, fighting or struggling
with these prison officials.

17) Plaintiff asked the other inmates to contact
legislation in Springfield, Illinois and to contact
the Governor Blagojevich and his family and then
Lt. Winston threw plaintiff against the wall, face
first, and then told plaintiff that the "Klan" (Klu
Klus Klan) "Ran the prison and that he (Lt. Winston)
knew what to do with people like him" (plaintiff)
and that they'd "find [plaintiff] dead in one of these
cells if [plaintiff] went to springfield or to the

Governor as a whistleblower." (See EX #2 and EX #3)

18) The plaintiff immediately filed an emergency grievance to Warden Winters. Emergency grievances are allowed directly to the Warden if the nature of grievance is important and or due to imminent danger factors. (See Department Rule § 504.840 of 20 Illinois Administrative Code amended at 27 Ill. Reg. 6214, effective May 1, 2003) Warden Winters did not answer or respond to that grievance. (See EX #4) Nor did Warden Winter have a delegated member answer it.

19) Shortly after being struck in testicles by Lt. Law, plaintiff's scrotem and testicles became enlarged from swelling and abnormal fluids. Plaintiff informed his condition to the Nurses and Medical Technicians at Western prison. These Nurses and Medical Technicians referred plaintiff to a Veteran Doctor by the name of Brown.

20) Dr. Brown determined that the swelling in testicles and scrotem was inflamed by epidemytis (damage of tissue that connects the testicles/scrotem to the tissue and or veins) Thus, Dr. Brown stated the testicles/scrotem tissue had been damaged and or possibly torn or severed (See EX #47 dated a few days after incident on 7-22-04)

21) From late July of 2004 to early 2005 plaintiff was extensively and repeatedly treated by Dr. Brown in an attempt to cure the newly developed epidemytis to the damaged tissue of testicles. (See medical records marked as Ex #48, Ex #49, Ex #50, Ex #51, Ex #52, Ex #53, Ex #54 and Ex #55)

22) Plaintiff was prescribed numerous amounts of medication and different therapeutics agents and various dosages to cure swelling, pain and abnormal fluids including bleeding of the testicles by Dr. Brown at Western C.C for the epidemytis. (See Ex #56, Ex #57, Ex #58 and Ex #59)

23) Plaintiff was also administered numerous other medications including piroxicam, salsalate, penicillin, Ibuprofen (200 m.g.), Tylenol, Disalcid (500 m.g.), Motrin (400 m.g.), Ibuprofen (400 m.g.), Doxycycline (100 m.g.), Ibuprofen (600 m.g.), Ciprofloxacin (500 m.g.) among other medications. Plaintiff was also given liquid form pain shots to numb testicles and to stabilize pain

24) Plaintiff also had to be furloughed out of Western C.C on 10-25-04 to see a urology specialist in or near Jacksonville, Illinois, at an off ground hospital/clinic after Dr. Brown and Western C.C medical Director determined further analysis, evaluation and treatment